# EXHIBIT 1

| | |
|---|---|
| DISTRICT COURT, COUNTY OF ADAMS, COLORADO<br>1100 Judicial Center Dr.<br>Brighton, Colorado 80601<br>(303) 659-1161 | |
| **Plaintiff:** GOLFTEC ENTERPRISES LLC, a Colorado limited liability company,<br><br>v.<br><br>**Defendants:** GOLF GALAXY, LLC, a Minnesota limited liability company; and DICK'S SPORTING GOODS, INC. a Delaware corporation, | ▲COURT USE ONLY ▲<br><br>Case Number: 2019CV____<br><br>Division: ___ |
| Andrew D. Ringel #24762<br>Hall & Evans, L.L.C.<br>1001 17th Street, Suite 300<br>Denver, CO 80202<br>303-628-3300<br>Fax: 303-628-3368<br>ringela@hallevans.com<br><br>Attorneys for Plaintiff | |
| **COMPLAINT FOR DECLARATORY RELIEF** | |

Plaintiff GOLFTEC Enterprises LLC, Colorado, by and through its attorneys, Andrew D. Ringel, Esq., of Hall & Evans, L.L.C., pursuant to C.R.S. §§ 13-51-101 *et seq.* and C.R.C.P. 57, hereby respectfully submits this Complaint for Declaratory Relief against Defendants Golf Galaxy, LLC and Dick's Sporting Goods, Inc., as follows:

## INTRODUCTION

1.    Plaintiff GOLFTEC Enterprises LLC and Defendants Golf Galaxy, LLC and Dick's Sporting Goods, Inc., as successors in interest, are parties to an Amended and Restated

3735631.1

Sublease Agreement regarding a sublease at 9490 Sheridan Boulevard, Westminster, Colorado 80030.

2.       A dispute exists between the Plaintiff and the Defendants over the meaning and applicability of provisions of the Amended and Restated Sublease Agreement.

3.       Plaintiff files this action seeking declaratory relief pursuant to C.R.S. §§ 13-51-101 *et seq.* and C.R.C.P. 57 concerning the meaning and applicability of provisions of the Amended and Restated Sublease Agreement.

4.       Specifically, Plaintiff seeks declaratory relief concerning the meaning and applicability of the provisions of the Amended and Restated Sublease Agreement and a determination from the Court concerning the parties' rights and obligations under the Agreement.

## PARTIES

5.       Plaintiff GOLFTEC Enterprises LLC ("GOLFTEC") is a Colorado limited liability company with its principal place of business located at 67 Inverness Drive East, Suite 175, Englewood, Colorado 80112.

6.       Defendant Golf Galaxy, LLC ("Golf Galaxy") is a Minnesota limited liability company with its principal place of business at 345 Court Street, Coraopolis, Pennsylvania 15108.

7.       Defendant Dick's Sporting Goods, Inc. ("Dick's") is a Delaware corporation with its principal place of business at 345 Court Street, Coraopolis, Pennsylvania 15108.

## JURISDICTION AND VENUE

8.       This dispute concerns the meaning and applicability of an Amended and Restated Sublease Agreement between the parties.

3735631.1                                    2

9.      This Court has subject matter jurisdiction over this dispute pursuant to C.R.S. § 13-51-105.

10.     GOLFTEC is a "person" within the meaning of C.R.S. § 13-51-103(1) and may initiate a declaratory judgment action pursuant to C.R.S. §§ 13-51-105 *et seq*.

11.     The Amended and Restated Sublease Agreement is the type of written legal document subject to a request for declaratory relief pursuant to C.R.S. § 13-51-106.

12.     Venue before the Court is proper because the subject of the Amended and Restated Sublease Agreement is property located at 9440 Sheridan Boulevard, Westminster, Colorado 80030 which is located in the County of Adams, State of Colorado.

13.     Venue before this Court is proper pursuant to C.R.C.P. 98(a) and C.R.C.P. 98(c)(1).

## GENERAL ALLEGATIONS

14.     GOLFTEC entered into an Amended and Restated Sublease Agreement with Golfsmith USA, L.L.C. ("Golfsmith") dated June 1, 2013 ("Agreement").  [*See* Agreement, attached hereto and incorporated herein as Exhibit A].

15.     The Agreement was for the purpose of GOLFTEC occupying a portion of a retail store space leased by Golfsmith for premises located at 9440 Sheridan Boulevard, Westminster, Colorado 80030.  [*See* Agreement, at 1, Exh. A].

16.     GOLFTEC agreed to a sublease of 1,430 square feet of the retail space leased by Golfsmith.  [*See* Agreement, § 1(a), Exh. A].

17.     The Agreement contains the following provision governing its Term:

2.      Term.

       (a)     The Sublease Term shall commence as of the Effective Date and shall expire on the same date as the expiration of the Prime Lease ("Term"), unless terminated earlier pursuant to the terms of this Sublease.

       (b)     If Golfsmith elects to exercise any available option to renew the Prime Lease or if Golfsmith enters into a new lease with respect to the Premises, then GolfTEC shall have the option to extend this Sublease on the same terms for a period of time coterminous with the extended Prime Lease or new lease.  Golfsmith will give GolfTEC at least ninety (90) days notice of its intent to exercise any options and GolfTEC will respond no later than thirty (30) days following said notice.

[*See* Agreement, § 2, Exh. A].

    18.    The Agreement contains the following provision concerning "Going Dark:"

    10.    <u>Going Dark</u>.

       (a)     In the event that either party:  (i) wishes to terminate this Sublease; or (ii) anticipates that it may elect to cease operations at any time prior to the expiration or termination of the Prime Lease per the sections below, said party will provide the other party at least one hundred eighty (180) days written notice of its intent to cease operations and/or terminate this Sublease.  Upon receipt of any notice of intent to cease operations or otherwise terminate this Sublease, each of the parties will appoint a designated senior business executive whose task it will be to meet for the purpose of discussing the cessation or termination of this Sublease and resolving any dispute related thereto.  Such executives will discuss the closure and/or termination and will negotiate in good faith in an effort to resolve any associated issues without the necessity of any formal proceeding relating thereto.

       (b)     In the event the decision to cease operations is a mutual decision, GolfTEC and Golfsmith shall each bear their pro rata share of such termination.  Golfsmith shall involve GolfTEC in any negotiations it engages in with its landlord for any buyout or other settlement with its landlord.

       (c)     Except in the case of casualty or condemnation, or as otherwise provided in this Sublease, in the event GolfTEC wishes to cease operations and terminate this Sublease as a result of GolfTEC's average revenue being below sixty percent (60%) of average revenue as compared to centers in similar markets and GolfTEC provides Golfsmith with the one hundred eighty (180) day notice stated above, GolfTEC shall have no

further obligation hereunder, except to remove all of its personalty from the Premises and pay Golfsmith three (3) months of Total Rent, plus an amount equal to the total of any Additional Fixed Rent that would otherwise be payable over the term of this Sublease.

(d)     Except in the case of casualty or commendation, or as otherwise provided in this Sublease, in the event GolfTEC abandons the Subleased Premises and fails to continually operate its business for a period of two (2) consecutive months, Golfsmith's remedy shall be either (i) the collection of Rent and other charges as the same become due under the terms of this Sublease, or (ii) the termination of this Sublease upon thirty (30) days written notice to GolfTEC. GolfTEC's right to cease to operate its business shall not affect GolfTEC's obligation to pay all amounts due hereunder and to perform all covenants and obligations hereunder.

(e)     If Golfsmith provides GolfTEC with the one hundred eighty (180) day notice as described above and GolfTEC is meeting or exceeding at least sixty percent (60%) of the average revenue it receives from comparable stores in similar markets, and GolfTEC would, but for Golfsmith's closure or termination of this Sublease, seek to continue operations, then GolfTEC shall have the option to relocate its operation. If GolfTEC relocates its operation, then, from and after the date of such relocation, GolfTEC shall have no further obligation hereunder, except that it shall remove all of its personalty from the Premises, and restore the Premises as required under Section 17 herein. Within thirty (30) days of such relocation, Golfsmith shall pay to GolfTEC a Fifteen Thousand Dollar ($15,000) relocation fee.

(f)     If Golfsmith does not provide the one hundred eighty (180) day notice as described above and GolfTEC is meeting or exceeding at least sixty percent (60%) of the average revenue it receives from comparable stores in similar markets, and would, but for Golfsmith's closure or termination of this Sublease, seek to continue operations, then Golfsmith shall pay GolfTEC: (1) six (6) months of EBITDA calculated based upon the same six (6) month period of the prior year; and (2) a Fifteen Thousand Dollar ($15,000) relocation fee. GolfTEC shall be obligated to remove all of its personalty from the Premises, and restore the premises under Section 17 herein.

[*See* Agreement, § 10, Exh. A].

19.     The Agreement contains the following provision for "Holding Over:"

13.   Holding Over.   If GolfTEC holds over after the expiration of the Term or earlier termination of this Sublease, without the express or implied consent of Golfsmith, then at the option of Golfsmith, GolfTEC will become and be only a month-to-month tenant at the rent stated in the Prime Lease or one hundred fifty percent (150%) of its then current Rent, whichever is less.   Notwithstanding any provision to the contrary contained herein, (a) Golfsmith expressly reserves the right to require GolfTEC to surrender possession of the Subleased Premises upon the expiration of the Term or upon earlier termination of this Sublease and the right to assert any remedy at law or in equity to evict GolfTEC and/or collect damages in connection with any hold over and (b) GolfTEC will indemnify, defend and hold Golfsmith harmless from and against all liabilities, claims, demands, actions, losses, damages, obligations, costs and expenses, including without limitation, attorney's fees (including allocated costs of Golfsmith's in house attorneys) incurred or suffered by Golfsmith by reason of GolfTEC's failure to surrender the Subleased Premises on the expiration of the Term or earlier Termination of this Sublease.

[*See* Agreement, § 13, Exh. A].

20.   The Agreement provides it is binding on the successors and assigns of both GOLFTEC and Golfsmith.   [*See* Agreement, § 32, Exh. A].

21.   Golfsmith entered bankruptcy in September 2016.

22.   Golf Galaxy purchased certain assets of Golfsmith in bankruptcy.

23.   Dick's owns Golf Galaxy.

24.   Dick's and Golf Galaxy assumed the Agreement with GOLFTEC from Golfsmith effective March 10, 2017.

25.   The original term of the Prime Lease expired October 31, 2015.

26.   The term of the Agreement expired on October 31, 2015.

27.   Pursuant to a Fourth Amendment to Lease dated February 25, 2015 (the "Fourth Amendment"), Golfsmith extended the term of the Prime Lease to October 31, 2020. [*See* the Fourth Amendment, attached hereto and incorporated herein as Exhibit B].

3735631.1

28.     Neither Golfsmith, Dick's nor Golf Galaxy has ever provided GOLFTEC with any notice pursuant to Section 2(b) of the Agreement of any intent to renew, extend or enter into a new Prime Lease and thereby provide GOLFTEC with the option to extend the term of its Sublease.

29.     GOLFTEC has never exercised its option to extend the term of the Sublease pursuant to Section 2(b) of the Agreement.

30.     Pursuant to Sections 2(b) and 13 of the Agreement, since October 31, 2015, GOLFTEC has been "Holding Over" and is a month-to-month sublease tenant pursuant to the Agreement.

31.     On September 3, 2019, GOLFTEC provided notice to Golf Galaxy and Dick's of its intent to terminate the Agreement effective September 30, 2019.  [*See* Joseph L. Assell Letter, September 3, 2019, attached hereto and incorporated herein as Exhibit C].

32.     On September 20, 2019, Golf Galaxy responded to GOLFTEC's September 3, 2019, notice disputing GOLFTEC's interpretation of the terms of the Agreement.   [*See* Lee J. Belitsky Letter, September 20, 2019, attached hereto and incorporated herein as Exhibit D].

33.     On October 7, 2019, GOLFTEC responded to Golf Galaxy's September 20, 2019, correspondence disputing Golf Galaxy's interpretation of the terms of the Agreement. [*See* Joseph L. Assell Letter, October 7, 2019, attached hereto and incorporated herein as Exhibit E].

34.     On October 24, 2019, Golf Galaxy responded to GOLFTEC's October 7, 2019, correspondence again disputing GOLFTEC's interpretation of the terms of the Agreement. [*See* Lee J. Belitsky Letter, October 24, 2019, attached hereto and incorporated herein as Exhibit F].

35.     Plaintiff and Defendants have a dispute over the interpretation and application of the Agreement.

## FIRST CLAIM FOR RELIEF
(Declaratory Relief Pursuant to C.R.S. §§ 13-51-101 *et seq.* and C.R.C.P. 57)

36.     Plaintiff incorporates herein the allegations in paragraphs 1 through 35 above.

37.     A controversy exists between the Plaintiff and Defendants concerning the interpretation and applicability of the Agreement between them.

38.     Pursuant to the Agreement, GOLFTEC qualifies as "Holding Over" and after October 31, 2015, was a month-to-month sublease tenant.

39.     GOLFTEC appropriately provided notice to Golf Galaxy and Dick's of the termination of the Agreement on September 3, 2019, effective September 30, 2019.

40.     Golf Galaxy and Dick's did not provide any notice to GOLFTEC concerning any intent to charge GOLFTEC either the rent stated in the Prime Lease or 150% of GOLFTEC's prior rent, whichever is less, as a "Holding Over" sublease tenant pursuant to Section 13 of the Agreement until October 24, 2019.

41.     Golf Galaxy and Dick's cannot appropriately charge GOLFTEC any increased rent as a "Holding Over" sublease tenant on a retroactive basis.

42.     The dispute between the Plaintiff and Defendants concerns the meaning of the Agreement, the status of GOLFTEC under the terms of the Agreement, the propriety of GOLFTEC's notice to Golf Galaxy and Dick's on September 3, 2019, GOLFTEC's "Holding Over" status and the timing and meaning of same under the Agreement, and the amounts owed, if any, under the terms of the Agreement.

43.     Plaintiff requests the Court enter a declaration concerning the meaning of the Agreement and determine (i) GOLFTEC qualified as "Holding Over" and a month-to-month sublease tenant as of October 31, 2015, (ii) GOLFTEC's notice to Golf Galaxy and Dick's on

September 3, 2019, was appropriate and the terms of the Agreement ended as of September 30, 2019, (iii) Golf Galaxy and Dick's did not notify GOLFTEC of any intent to charge GOLFTEC either the rented stated in the Prime Lease or 150% of GOLFTEC's prior rent, whichever is less, as a "Holding Over" sublease tenant pursuant to Section 13 of the Agreement until October 24, 2019, and cannot charge any increased rent on a retroactive basis, and (iv) pursuant to the terms of the Agreement, no amount is due from GOLFTEC under the Agreement following the effective date of the termination.

## PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, Plaintiff GOLFTEC Enterprises LLC respectfully requests the Court grant the following relief against Defendants Golf Galaxy, LLC and Dick's Sporting Goods, Inc.:

A. Find and declare the meaning of the Agreement;

B. Find and declare as of October 31, 2015, GOLFTEC qualified as "Holding Over" and as a month-to-month sublease tenant under the terms of the Agreement;

C. Find and declare GOLFTEC's notice dated September 3, 2019, was effective under the terms of the Agreement and the Agreement ended as of September 30, 2019;

D. Find and declare Golf Galaxy and Dick's did not notify GOLFTEC of any intent to charge GOLFTEC either the rent stated in the Prime Lease or 150% GOLFTEC's prior rent, whichever is less, as a "Holding Over" sublease tenant pursuant to Section 13 of the Agreement until October 24, 2019, and cannot charge any increased rent on a retroactive basis;

E. Find and declare no further amounts are owed by GOLFTEC to Golf Galaxy and Dick's under the terms of the Agreement;

F.      Award GOLFTEC its attorney's fees and costs pursuant to the terms of the Agreement; and

G.      All other and further relief as the Court deems just and appropriate under the circumstances.

Dated this 14th  day of November, 2019

Respectfully submitted,


/s/ Andrew D. Ringel
Andrew D. Ringel #24762
Hall & Evans, L.L.C.
1001 17th Street, Suite 300
Denver, CO 80202
303-628-3300
Fax: 303-628-3368
ringela@hallevans.com

**ATTORNEYS FOR PLAINTIFF
GOLFTEC ENTERPRISES LLC**

Address of Plaintiff:
GOLFTEC Enterprises LLC
67 Inverness Drive East, Suite 175
Englewood, Colorado 80112



**AMENDED AND RESTATED
SUBLEASE AGREEMENT
Westminster #007 – Training Center**

This Amended and Restated Sublease Agreement ("Sublease") dated this 1st day of June, 2013 ("Effective Date") by and between Golfsmith USA, L.L.C., a Delaware limited liability company ("Golfsmith" or "Sublandlord") and GolfTEC Enterprises LLC, a Colorado limited liability company ("GolfTEC" or "Subtenant").

## WITNESSETH:

WHEREAS, Golfsmith is the Tenant under that certain Lease Agreement, (the "Primo Lease") attached as "Exhibit A", by and between Galileo Westminster LLC, a Delaware limited liability company, as Landlord, ("Landlord"), and Golfsmith, as Tenant, effective March 1, 1996 for the premises described in the Prime Lease as 9440 Sheridan Boulevard, Westminster, CO 80030 (the "Premises");

WHEREAS, Golfsmith has entered into the Prime Lease for retail store space and GolfTEC seeks to occupy a portion of the Premises leased by Golfsmith;

WHEREAS, Golfsmith wishes to permit GolfTEC to occupy the Subleased Premises (defined below) pursuant to this Sublease and GolfTEC wishes to occupy the Subleased Premises for the purposes of operating a golf game improvement facility inside Golfsmith's store;

WHEREAS, GolfTEC and Golfsmith entered into a Sublease Agreement, dated April 3, 2007 (the "Original Sublease") for premises (the "Premises") more particularly described in the Original Sublease;

WHEREAS, Golfsmith and GolfTEC have previously entered into the following documents, instruments and agreements with respect to the Sublease Premises: First Amendment to Sublease Agreement dated on or about April 17, 2007 (the "First Amendment"), the Original Sublease, as amended by the First Amendment shall hereinafter be referred to as the "Sublease" (collectively, the "Prior Documents"); and

WHEREAS, the parties wish to amend and restate the rights, duties and obligations described in the Prior Documents;

NOW THEREFORE, in consideration of the obligations and agreements contained herein, the sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.     Subleased Premises.

(a)     Subject to the terms, covenants and conditions of the Prime Lease and this Sublease, Golfsmith subleases and grants to GolfTEC and GolfTEC accepts from Golfsmith a portion of the Premises consisting of approximately 1,430 square feet as more particularly described in "Exhibit B" attached hereto (the "Subleased Premises") for the "Term" hereof, as defined below.

(b)     GolfTEC hereby agrees to abide by and observe all the terms, covenants and conditions of the Prime Lease.  The relationship between GolfTEC and Golfsmith shall be the same as that between Golfsmith and Landlord under the Prime Lease.

2.  Term.

(a)     The Sublease Term shall commence as of the Effective Date and shall expire on the same date as the expiration date of the Prime Lease ("Term"), unless terminated earlier pursuant to the terms of this Sublease.

(b)     If Golfsmith elects to exercise any available option to renew the Prime Lease or if Golfsmith enters into a new lease with respect to the Premises, then GolfTEC shall have the option to extend this Sublease on the same terms for a period of time coterminous with the extended Prime Lease or new lease. Golfsmith will give GolfTEC at least ninety (90) days notice of its intent to exercise any options and GolfTEC will respond no later than thirty (30) days following said notice.

3.  Rent.

(a)     Definitions.

(i)     Percentage Rent:  nine percent (9%) of GolfTEC's gross revenues from any and all lessons given and practice sessions sold at the Subleased Premises.

(ii)    Rent:  GolfTEC's Pro Rata Share of Golfsmith's base monthly rent, as described in the Prime Lease.

(iii)   Additional Rent:  $761.85 per month (intended to reflect a fair approximation GolfTEC's Pro Rata Share of the variable costs under the Prime Lease for which Golfsmith is liable).

(iv)    GolfTEC's Pro Rata Share: the fraction the numerator of which shall be the square footage of the Sublease Premises and the denominator of which shall be the square footage of the Premises.

(v)     Utility and Trash Fee:  $264.98 per month (intended to reflect a fair approximation GolfTEC's Pro Rata Share of the utility costs under the Prime Lease for which Golfsmith is liable).

(vi)    Total Rent:  Rent plus Additional Rent plus Trash and Utility Fee.

(vii)   Earned Rent:  The difference between Percentage Rent and Total Rent.

(b)     GolfTEC shall pay to Golfsmith Total Rent payable in advance, in monthly installments, without deductions or set-offs and without prior demand on or before the fifteenth (15th) day of each calendar month during the Term hereof. Total Rent and Percentage Rent shall be reconciled on an annual basis per Section 3(d) below.

(c)     Total Rent shall commence the earlier of (i) fifteen (15) business days from the date Golfsmith delivers possession of the Subleased Premises to GolfTEC; or (ii) the date GolfTEC opens for business ("Rent Commencement Date") and continuing through the expiration of the Term. Notwithstanding that the Rent Commencement Date shall occur after the Effective Date, all provisions of this Sublease, other than with respect to payment of Rent, shall be fully applicable and this Sublease shall be effective as of the Effective Date.

(d)    GolfTEC shall report to Golfsmith all revenue of lessons given and practice sessions sold at the Subleased Premises at the end of each calendar year. At such time, Golfsmith and GolfTEC shall reconcile Total Rent against Percentage Rent and determine the Earned Rent to be paid to Golfsmith. If there is a shortfall, GolfTEC shall pay the difference to Golfsmith within thirty (30) days of GolfTEC's receipt of the reconciliation from Golfsmith. Golfsmith shall be allowed to audit the records of GolfTEC, but not more than once annually, and not during the period of January through April of any calendar year, such audits to be conducted during normal business hours, and with reasonable advance notice to GolfTEC.

(e)    If Total Rent is not received by Golfsmith on or before the sixth business day after the date of the month for which Total Rent is due, a service charge equal to six percent (6%) of the overdue payment shall be charged and payable in addition to the monthly Total Rent due. The parties acknowledge and agree that Golfsmith will incur additional administrative costs as a result of such late payment and that the above charge represents a fair approximation of such additional administrative costs as opposed to a fee or a penalty.

4.    Use.  GolfTEC may use the Subleased Premises for the operation of golf game improvement services including lessons, practice, club fitting, golf conditioning and other game improvement services. GolfTEC shall operate the Subleased Premises a minimum of eighty percent (80%) of Golfsmith's hours of operation or sixty (60) hours a week, whichever is less. Deviation from the foregoing hours shall require a written waiver from Golfsmith which shall not be unreasonably withheld. GolfTEC's use and access to common areas and other non-proprietary areas at the Premises shall be subject to all of Golfsmith's and Landlord's security, traffic, and smoke free environment restrictions. All personnel, employees and agents of GolfTEC and of Golfsmith shall conduct their respective activities in a quiet and businesslike manner, and will refrain from any interference with the business or other operations of the other party.

5.    Operating Requirement.  During the time GolfTEC is operating its business in the Subleased Premises, GolfTEC agrees to conduct its business in a reasonable and prudent manner, consistent with reputable business standards and practices.

6.    Design and Construction.

[Intentionally Deleted.]

7.    Signs.  GolfTEC may display a minimum of two (2) GolfTEC signs within the Subleased Premises. Such signs must be approved by Golfsmith before being placed on display within the Subleased Premises. One (1) of the two (2) signs will be either a soffit sign or a suspended departmental sign, at GolfTEC's option. In either case the sign will be suspended immediately over the GolfTEC front desk and the entire sign must be visible, without any obstructions, from the front door of the Premises. Golfsmith will use its commercially reasonable efforts to assist GolfTEC in obtaining Landlord and governmental approval for GolfTEC exterior signage and all initial requests will display a thirty-six inch (36") external GolfTEC button sign or as required by the city in which the Premises are located.

8.    Utilities, HVAC and Other Maintenance.

(a)    As part of this Sublease, Golfsmith will provide utility and internet access (for internet access, GolfTEC is responsible for providing a secure router meeting Golfsmith's specifications in order to protect Golfsmith's proprietary online information). Golfsmith shall permit GolfTEC access to and use of Golfsmith's T1 line to facilitate GolfTEC's VOIP or like phone/data system.

(b)      In the event the term of this Sublease is extended beyond the initial term (as described in Section 2(b) above) then Golfsmith shall recalculate the Utility Fee for each such extension and shall apprise GolfTEC of such recalculation within thirty (30) days of the expiration of the prior term.

(c)      [Intentionally Deleted.]

(d)      To the extent that Golfsmith is responsible for the maintenance of the HVAC system under the Prime Lease, Golfsmith will provide HVAC system maintenance and repairs in a commercially reasonable manner not inconsistent with the maintenance and repair of the HVAC system for the non-subleased premises and as required by the Prime Lease.  In addition to the amounts described in Section 3 above, GolfTEC will be responsible for GolfTEC's Pro Rata Share of the HVAC maintenance provided for by Golfsmith.  To the extent that any HVAC maintenance is the responsibility of the Landlord under the Prime Lease, and not Golfsmith, Golfsmith will prosecute service and or maintenance for the benefit of GolfTEC.  Prior notice to GolfTEC shall be required in the event GolfTEC's Pro Rata Share of HVAC repairs or maintenance may exceed Two Thousand Dollars ($2,000) in any instance.

(e)      In the event that Golfsmith renovates or remodels the Premises, whether such event is to integrate GolfTEC into the Premises after Golfsmith has already been opened for business, or causes a relocation or modification to the Subleased Premises, Golfsmith will ensure that the HVAC service quality to GolfTEC is adequate to accommodate GolfTEC's operations.

(f)      Should Golfsmith be responsible for any other maintenance not provided in CAM, GolfTEC will be responsible for GolfTEC's Pro Rata Share of such maintenance to the extent such other maintenance extends to or benefits GolfTEC and the Subleased Premises.  However, prior notice to GolfTEC shall be required in the event GolfTEC's pro rata share of other maintenance may exceed Two Thousand Dollars ($2,000) in any instance.

9.      Exclusivity.

(a)      During the term of this Sublease, GolfTEC will not operate a training facility in any other golf or sporting goods store within a twenty (20) mile radius from the Premises without Golfsmith's prior written approval, such approval to be withheld by Golfsmith in its sole discretion.

(b)      During the term of this Sublease, GolfTEC and its employees are strictly prohibited at the Subleased Premises from selling, promoting, or referring any customer to any third party golf retailer or other channel to purchase any product or service offered by Golfsmith.

(c)      During the term of this Sublease, Golfsmith will not offer golf game improvement services in the Premises and its employees are strictly prohibited from promoting or referring its customer to any third party for golf game improvement services offered by GolfTEC.  Additionally, in the event Golfsmith terminates this Sublease for any reason other than for cause, Golfsmith will not operate golf instruction in the Premises for a period of one (1) year following such termination.

10.     Going Dark.

(a)      In the event that either party: (i) wishes to terminate this Sublease; or (ii) anticipates that it may elect to cease operations at any time prior to the expiration or termination of the Prime Lease per the sections below, said party will provide the other party at least one hundred eighty (180) days written notice of its intent to cease operations and/or terminate this Sublease.  Upon receipt of any notice of intent to cease operations or otherwise terminate this Sublease, each of the parties will

appoint a designated senior business executive whose task it will be to meet for the purpose of discussing the cessation of operations or termination of this Sublease and resolving any dispute related thereto. Such executives will discuss the closure and/or termination and will negotiate in good faith in an effort to resolve any associated issues without the necessity of any formal proceeding relating thereto.

        (b)    In the event the decision to cease operations is a mutual decision, GolfTEC and Golfsmith shall each bear their pro rata share of such termination. Golfsmith shall involve GolfTEC in any negotiations it engages in with its landlord for any buyout or other settlement with its landlord.

        (c)    Except in the case of casualty or condemnation, or as otherwise provided in this Sublease, in the event GolfTEC wishes to cease operations and terminate this Sublease as a result of GolfTEC's average revenue being below sixty percent (60%) of average revenue as compared to centers in similar markets and GolfTEC provides Golfsmith with the one hundred eighty (180) day notice stated above, GolfTEC shall have no further obligation hereunder, except to remove all of its personalty from the Premises and pay to Golfsmith three (3) months of Total Rent, plus an amount equal to the total of any Additional Fixed Rent that would otherwise be payable over the term of this Sublease.

        (d)    Except in the case of casualty or condemnation, or as otherwise provided in this Sublease, in the event GolfTEC abandons the Subleased Premises and fails to continually operate its business for a period of two (2) consecutive months, Golfsmith's remedy shall be either (i) the collection of Rent and other charges as the same become due under the terms of this Sublease, or (ii) the termination of this Sublease upon thirty (30) days written notice to GolfTEC. GolfTEC's right to cease to operate its business shall not affect GolfTEC's obligation to pay all amounts due hereunder and to perform all covenants and obligations hereunder.

        (e)    If Golfsmith provides GolfTEC with the one hundred eighty (180) day notice as described above and GolfTEC is meeting or exceeding at least sixty percent (60%) of the average revenue it receives from comparable stores in similar markets, and GolfTEC would, but for Golfsmith's closure or termination of this Sublease, seek to continue operations, then GolfTEC shall have the option to relocate its operation. If GolfTEC relocates its operation, then, from and after the date of such relocation, GolfTEC shall have no further obligation hereunder, except that it shall remove all of its personalty from the Premises, and restore the Premises as required under Section 17 herein. Within thirty (30) days of such relocation, Golfsmith shall pay to GolfTEC a Fifteen Thousand Dollar ($15,000) relocation fee.

        (f)    If Golfsmith does not provide the one hundred eighty (180) day notice as described above and GolfTEC is meeting or exceeding at least sixty percent (60%) of the average revenue it receives from comparable stores in similar markets, and would, but for Golfsmith's closure or termination of this Sublease, seek to continue operations, then Golfsmith shall pay to GolfTEC: (1) six (6) months of EBITDA calculated based upon the same six (6) month period of the prior year; and (2) a Fifteen Thousand Dollar ($15,000) relocation fee. GolfTEC shall be obligated to remove all of its personalty from the Premises, and restore the Premises as required under Section 17 herein.

    11.    Relocation. During the term of this Sublease, if, for any reason, Golfsmith chooses to move the Premises or chooses to move the GolfTEC Subleased Premises within the Premises, Golfsmith will pay for all costs associated with the move, including the expense of tenant improvements for the new subleased premises.

    12.    Alterations. GolfTEC will not make any alterations to the Subleased Premises without prior review and approval by Golfsmith. All plans must be submitted to Golfsmith for review and approval, which approval may be withheld by Golfsmith in its sole discretion. All contractors or subcontractors performing work on the Subleased Premises must be approved by Golfsmith and provide

proof to Golfsmith of Golfsmith's required insurance prior to commencement of such work. GolfTEC shall not, under any circumstances, allow the Subleased Premises or the Premises to be subjected to any lien or claim arising from GolfTEC's work, shall promptly cause any such lien or claim to be released and shall indemnify Golfsmith and the Landlord for any cost, expense or liability arising therefrom.

13.     Holding Over.   If GolfTEC holds over after the expiration of the Term or earlier termination of this Sublease, without the express or implied consent of Golfsmith, then at the option of Golfsmith, GolfTEC will become and be only a month-to-month tenant at the rent stated in the Prime Lease or one hundred fifty percent (150%) of its then current Rent, whichever is less. Notwithstanding any provision to the contrary contained herein, (a) Golfsmith expressly reserves the right to require GolfTEC to surrender possession of the Subleased Premises upon the expiration of the Term or upon the earlier termination of this Sublease and the right to assert any remedy at law or in equity to evict GolfTEC and/or collect damages in connection with any hold over and (b) GolfTEC will indemnify, defend and hold Golfsmith harmless from and against any and all liabilities, claims, demands, actions, losses, damages, obligations, costs and expenses, including, without limitation, attorney's fees (including the allocated costs of Golfsmith's in house attorneys) incurred or suffered by Golfsmith by reason of GolfTEC's failure to surrender the Subleased Premises on the expiration of the Term or earlier termination of this Sublease.

14.     Default and Remedies.   The following are events of default by GolfTEC under this Sublease: (i) failure to make rental payments when such payments are due and such failure continues for thirty (30) calendar days; (ii) any events of default by GolfTEC under this Sublease or listed as "Events of Default" by Tenant as set forth in the Prime Lease, (iii) failure to surrender the Subleased Premises upon expiration of the Sublease; or (iv) breach by GolfTEC of any other term, covenant or condition of this Sublease that is not cured with thirty (30) calendar days after GolfTEC has received written notice from Golfsmith of such breach, or in the case of a breach reasonably requiring more than thirty (30) calendar days to cure, which is not cured within a reasonable time after the giving of such notice, provided, that the curing of the breach is commenced within such thirty (30) calendar day period after notice and is diligently prosecuted to completion.   Upon the occurrence of a default by GolfTEC, Golfsmith, at Golfsmith's option, may terminate this Sublease by giving written notice of termination to GolfTEC, effective as of the date set forth in such notice, and Golfsmith may reenter the Subleased Premises and take complete and peaceful possession of the Subleased Premises.   Notwithstanding the terms of this Section 14, prior to Golfsmith taking any formal action hereunder, each of the parties will appoint a designated senior business executive whose task it will be to meet for the purpose of discussing the default and resolving any dispute related thereto within three (3) business days of Golfsmith's Notice of Default. Such executives will discuss the default and will negotiate in good faith in an effort to resolve the default within five (5) business days of the Event of Default without the necessity of any formal proceeding relating thereto.

15.     Golfsmith Liability.   Golfsmith shall have no liability to GolfTEC for any wrongful action or default on the part of Landlord pursuant to the terms of the Prime Lease, and GolfTEC hereby agrees to look solely to Landlord in event of any such default, the liability and obligations of Golfsmith being solely pursuant to the terms and conditions of this Sublease.

16.     Damage and Condemnation.   If the Subleased Premises is partially or totally destroyed from any cause, or if all or part of the Subleased Premises is taken by any condemnation or other taking by any governmental agency, this Sublease will automatically terminate if and when the Prime Lease terminates, but will otherwise remain in full force and effect, subject to abatement of Rent on a pro rata basis to the extent the Subleased Premises shall be partially or totally uninhabitable.

17.    Surrender.  Upon termination of this Sublease, all personal property brought into the Subleased Premises by GolfTEC shall be removed by GolfTEC and GolfTEC will repair all damage to the Subleased Premises caused by such removal and will return the Subleased Premises to Golfsmith in substantially the same condition as when GolfTEC took possession of the Subleased Premises under this Sublease, reasonable wear and tear excepted.

18.    Notices.  Any notice or other communication required or permitted to be given under this Sublease or under the Prime Lease will be in writing and will be deemed to have been given when delivered in the manner and to the applicable addresses set forth below or at such other address as either party may furnish to the other in writing:

| If to Golfsmith: | Golfsmith USA, L.L.C. |
| | 11000 North IH-35 |
| | Austin, Texas 78753 |
| | (512) 837-1019 (facsimile) |
| | Attention:  VP, Retail Growth & Development |
| | |
| cc: | Golfsmith International, Inc. |
| | 11000 North IH-35 |
| | Austin, Texas 78753 |
| | (512) 837-1019 (facsimile) |
| | Attention:  General Counsel |
| | |
| If to GolfTEC: | GolfTEC Enterprises, LLC |
| | 12450 E. Arapahoe Rd., Suite B |
| | Centennial, Colorado 80112 |
| | (303) 741-1791 (facsimile) |
| | Attention: Legal |

19.    Quiet Possession.  Golfsmith covenants with GolfTEC that, so long as GolfTEC is not in default under the terms of this Sublease, GolfTEC will have quiet possession of the Subleased Premises for the entire term of the Sublease.  Golfsmith agrees to comply with and enforce all of the terms and provisions of the Prime Lease.

20.    Assignment and Subletting.  GolfTEC will not assign its rights under this Sublease to anyone other than an approved and authorized GolfTEC franchisee without the express written consent of Golfsmith which consent may be withheld by Golfsmith in its sole and absolute discretion. Notwithstanding the foregoing, GolfTEC may assign its rights to a bona fide franchisee ("Franchisee") with the express understanding that: (i) the Franchisee agrees in writing to be bound by the terms and conditions of this Sublease and acknowledges in writing that this Sublease is subject to the terms and conditions of the Prime Lease, and (ii) GolfTEC agrees by its execution of this Sublease to guarantee the performance of the Franchisee and assumes all obligations hereunder in the event of Franchisee's default.

21.    Indemnity.

(a)    GolfTEC's Indemnity.  GolfTEC will indemnify, protect and hold Golfsmith and Landlord and its assigns and its mortgagees harmless from and against any and all liabilities, claims, demands, losses, damages, costs and expenses (including attorneys' fees) arising out of or relating to: (i) the use or occupancy of the Subleased Premises by GolfTEC or anyone claiming by, through or under GolfTEC; (ii) the failure by GolfTEC or anyone claiming by, through or under GolfTEC to comply with any term, condition, or covenant of this Sublease or the Prime Lease, including, without limitation,

GolfTEC's obligation to surrender the Subleased Premises on the expiration date in the condition herein required; (iii) the negligence or willful misconduct of GolfTEC or anyone claiming by, through or under GolfTEC; (iv) the death of or injury to any person or damage to any property on or about the Subleased Premises which is due to the negligence or willful misconduct of the GolfTEC; or (v) GolfTEC's breach or default under this Sublease or, to the extent incorporated herein, the Prime Lease.

(b)    Golfsmith's Indemnity.  Golfsmith will indemnify, protect and hold GolfTEC harmless from and against any and all liabilities, claims, demands, losses, damages, costs and expenses (including attorneys' fees) arising out of or relating to: (i) the failure by Golfsmith or anyone claiming by, through or under Golfsmith (excluding GolfTEC), to comply with any term, condition, or covenant of the Prime Lease; (ii) Golfsmith's breach or default under the Prime Lease; (iii) the negligence or willful misconduct of Golfsmith or anyone claiming by, through or under Golfsmith; or (iv) the death of or injury to any person or damage to any property on or about the Subleased Premises which is due to the negligence or willful misconduct of the Golfsmith.

22.    Insurance.  GolfTEC, at its own expense, shall maintain, during the Term hereof, a policy or policies of (i) workers' compensation insurance in at least the amounts required by the state in which the Subleased Premises is located; (ii) commercial general liability insurance in at least the amount of One Million Dollars ($1,000,000.00) combined single limit and Three Million Dollars ($3,000,000.00) in the aggregate for personal injuries or deaths of persons occurring in or about the Subleased Premises, and (iii) all risk coverage insurance covering the replacement cost of (a) all alterations, additions, partitions and improvements installed or placed on the Subleased Premises by GolfTEC, Golfsmith or by Landlord on behalf of GolfTEC or Golfsmith; and (b) all of GolfTEC's personal property contained within the Subleased Premises.  Said policies shall (i) name Golfsmith and Landlord, their management agents for the Premises and their lenders with respect to the Subleased Premises as additional insureds; (ii) be issued by an insurance company which has a Best Rating of at least A; and (iii) provide that said insurance shall not be canceled unless thirty (30) days prior written notice has been given to Golfsmith.  Certificates of such insurance shall be delivered to Golfsmith by GolfTEC upon the commencement date and upon each renewal of the insurance.

23.    Entry by Golfsmith.  GolfTEC shall permit Landlord, Golfsmith, and the agents of Landlord and Golfsmith, to enter upon the Subleased Premises at all times permitted under the terms of the Prime Lease to examine the condition thereof and conditions of GolfTEC's occupancy or to make repairs, additions or alterations therein as Landlord or Golfsmith may deem necessary and as permitted under the terms of the Prime Lease.  In the event that such entry is not for the purposes of making an emergency repair, Golfsmith and/or Landlord shall enter during GolfTEC's normal business hours after reasonable prior notice to GolfTEC and it will be GolfTEC's obligation to ensure that an employee of GolfTEC will be present during such visits by the Golfsmith or Landlord.

24.    No Waiver.  No waiver, on the part of Golfsmith or its successors or assigns, of any default or breach by GolfTEC of any covenant, agreement or condition of this Sublease shall be construed to be a waiver of the rights of Golfsmith or as to any prior or future default or breach by GolfTEC.

25.    Remedies Cumulative.  The remedies available under the terms of this Sublease and at law or in equity shall be cumulative and the exercise of one remedy shall not constitute an election of or waiver of remedies.

26.    Independent Contractor.  Each party to this Sublease is and shall be an independent contractor.  Nothing in this Sublease will be construed to place the parties in the relationship of a joint venture or partners or associates or principal and agent.  Neither party has any rights to encumber the other party in any manner not expressly granted herein.

27.    Governing Law. This Sublease shall be governed by and construed in accordance with the domestic substantive laws of the State in which the Subleased Premises is located, without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any other jurisdiction. GolfTEC hereby consents to the personal jurisdiction and venue of any Texas State Court located in the County of Travis and any successor court, and the service or process by any means authorized by such court.

28.    Waiver of Trial by Jury. GolfTEC hereby waives any and all rights it may have under applicable law to trial by jury with respect to any dispute with Golfsmith arising directly or indirectly in connection with this Sublease, the Prime Lease, or the Subleased Premises. Nothing contained in this section shall be construed as a waiver by Landlord of any of its rights to trial by jury in connection with the Prime Lease or Sublease for any claims or causes of action so triable.

29.    Attorneys' Fees. In the event of any litigation between the parties pertaining to the subject matter of this Sublease, the prevailing party in such litigation will be awarded its costs and expenses incurred with respect to such litigation, including, but not limited to, reasonable attorney's fees and expenses.

30.    LIMITATION OF LIABILITY. IN NO EVENT SHALL EITHER PARTY HAVE ANY LIABILITY FOR INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES, HOWEVER CAUSED AND ON ANY THEORY OF LIABILITY, ARISING OUT OF THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO LOSS OF ANTICIPATED PROFITS, LOSS OF DATA OR GOODWILL, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

31.    Employment. The parties mutually agree that without the prior written mutual consent of the parties, neither party will solicit or recruit any person for employment from the employment of the other party unless such person has been out of the employment of the other party for a period of not less than two (2) years.

32.    Miscellaneous Provisions. This Sublease cannot be modified except by a properly executed written instrument. This Sublease will be binding upon and will inure to the benefit of the respective successors and assigns of Golfsmith and GolfTEC. The headings to the various paragraphs of this Sublease are for reference purposes only and will have no effect upon the construction or interpretation of any part of this Sublease. If any term, covenant or condition of this Sublease is held to be invalid, illegal or unenforceable as to a particular person, entity or situation, this Sublease will be construed and enforced without such provision, but will be otherwise enforced to the fullest extent permitted by law as to such person, entity or situation, and this Sublease will also be enforced to the fullest extent permitted by law as to any other person, entity or situation. This Sublease may be executed in several counterparts each of which will be considered an original and all of which together will constitute one instrument.

33.    Entire Agreement. This instrument constitutes the entire agreement between Golfsmith and GolfTEC and supersedes any prior understandings and written or oral agreements between the parties with regard to the Subleased Premises.

IN WITNESS WHEREOF, the parties have caused this Sublease to be duly executed as of the date first above written.

GOLFSMITH USA, L.L.C.,
a Delaware limited liability company

By: _____

~~Adrian Gonzalez,~~
~~Vice President, Retail Growth and~~
~~Development~~

**James A Eliasberg**
**Vice President, General Counsel**
**and Secretary**

GOLFTEC ENTERPRISES, LLC,
a Colorado limited liability company

By: _____

Joseph L. Assell, President and CBO

## EXHIBIT "A"

### PRIME LEASE

## EXHIBIT "B"

### SUBLEASED PREMISES



EXHIBIT

**B**

## FOURTH AMENDMENT TO LEASE

THIS FOURTH AMENDMENT TO LEASE ("Amendment") is entered into as of this 25th day of February, 2015, by and among BRIXMOR GA WESTMINSTER LLC, a Delaware limited liability company, having an address at c/o Brixmor Property Group, 40 Skokie Boulevard, Suite 600, Northbrook, Illinois 60062 ("Landlord"), and GOLFSMITH USA, INC., a Texas corporation, having an address at 11000 North I.H. 35, Austin, Texas 78753, and doing business as "Golfsmith USA" ("Tenant").

### RECITALS

A.  WHEREAS, Landlord's predecessor-in-interest and Tenant's predecessor-in-interest entered into that certain written Lease agreement dated March 1, 1996, as amended by that certain written Assignment of Lease dated June 4, 1996, as further amended by that certain written First Amendment to Lease and Confirmation of Lease Terms dated August 13, 1996, as amended by that certain written Assignment and Assumption of Lease dated February 18, 1998, as further amended by that certain written Amendment of Lease No. 2 dated February 14, 2005, and as further amended by that certain written Amendment of Lease No. 3 dated April 13, 2007 (collectively, the "Lease"), for the lease of certain retail space currently identified as Store No. 01, for approximately 17,233 square feet of space ("Demised Premises"), as depicted in Exhibit A attached hereto, in what is commonly referred to as Westminster City Center, a shopping center located in the City of Westminster, State of Colorado ("Shopping Center").

B.  WHEREAS, the Lease shall expire on October 31, 2015.

C.  WHEREAS, Landlord and Tenant desire, among other things, to extend the term of the Lease.

### TERMS

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by Tenant, the parties agree as follows:

1.  **LEASE TERM.** Landlord and Tenant hereby agree to extend the term, as defined in the Lease, for a period of sixty (60) full calendar months from November 1, 2015 to October 31, 2020 ("Extended Term"), upon the following terms and conditions.

2.  **MINIMUM ANNUAL RENT.** Tenant shall continue to tender Minimum Annual Rent, and all other Rent, in accordance with the terms of Lease, without offset, deduction, or credit, except that during the Extended Term Minimum Annual Rent shall be as follows:

| Period | PSF | Annually | Monthly |
|---|---|---|---|
| November 1, 2015 to October 31, 2020 | $18.08 | $311,572.64 | $25,964.39 |

3.  **OPTION TO EXTEND THE LEASE TERM.** The First Extended Term, as defined in the Amendment of Lease No. 3 is hereby replaced by this Amendment. The Second Extended Term granted to Tenant under the Lease shall remain.

4.  **OPTION TERM MINIMUM ANNUAL RENT.** During the Second Extended Term, Tenant covenants and agrees to pay Minimum Annual Rent to Landlord, in equal monthly installments, in advance, as follows:

| Period | PSF | Annually | Monthly |
|---|---|---|---|
| November 1, 2020 to October 31, 2025 | $19.00 | $327,427.00 | $27,285.58 |

5.  **TENANT'S WORK.** Tenant agrees that it shall make certain non-structural, non-mechanical improvements to the interior of the Demised Premises specifically including, without limitation, exterior signage (the "Remodel Work") within twelve (12) months following the date of this Amendment. The

Westminster City Center Shopping Center / BU: 518201
Golfsmith USA, Inc. dba Golfsmith USA

Remodel Work shall strictly conform to the terms and conditions set forth in the Lease including, but not limited to, Article VI, "Tenant's Construction and Maintenance". The Remodel Work shall include all improvements necessary to operate Tenant's business all of which shall be at Tenant's sole cost and expense. The plans and specifications, if any are needed, and the detail and design shall be subject to the written approval of Landlord or Landlord's architect.

6.    **TENANT ALLOWANCE.**

(a)    As an inducement to the execution and delivery of this Amendment and the performance by Tenant of all obligations under the Lease, Landlord agrees to reimburse Tenant, in consideration therefor, an amount up to Two Hundred Thousand and 00/100 Dollars ($200,000.00) ("Tenant Allowance") which Tenant must use to perform the Remodel Work.

(b)    On or after the date Tenant shall have incurred Remodel Work expenses totaling at least fifty percent (50%) of the Tenant Allowance, provided Landlord may defer payment until Tenant cures any then-existing default under the Lease with respect to any required monetary payment beyond any applicable notice and cure period, and further provided Tenant has delivered to Landlord a written request from Tenant including a reasonable breakdown of Tenant's total Remodel Work costs to date, together with proof, reasonably satisfactory to Landlord, of payment thereof, and Tenant's Form W-9, then Landlord shall, within thirty (30) days thereafter pay to Tenant the portion of the Tenant Allowance requested. Notwithstanding anything to the contrary contained herein, Tenant shall not be obligated to provide copies of invoices as proof of Tenant's total Remodel Work costs.

(c)    The Tenant's Allowance is for the purpose of constructing or improving qualified long term real property for use in Tenant's trade or business at the Demised Premises, in accordance with Section 110 (a) of the Internal Revenue Code. Landlord shall be the legal title and beneficial owner of all qualified long term real property (as defined in Section 110(a) of the Internal Revenue Code) that are acquired with or funded by the Tenant's Allowance. The parties understand that qualified long-term real property is as defined in Section 110(a) of the Internal Revenue Code. If Tenant's final accounting of the costs related to the Remodel Costs reveals that the Tenant Allowance exceeds the cost of the qualified long-term real property (as defined in Section 110(a) of the Internal Revenue Code), Tenant shall use good faith efforts to notify Landlord of the amount of such excess.

(d)    On or after the date Tenant shall have completed all of the Remodel Work or have completed a portion of the Remodel Work sufficient to incur expenses that will exhaust the total Tenant Allowance, provided Landlord may defer payment until Tenant cures any then-existing default under the Lease with respect to any required monetary payment beyond any applicable notice and cure period, and further provided Tenant has delivered to Landlord: (i) a written request from Tenant including a reasonable breakdown of Tenant's total construction costs to date, together with proof, reasonably satisfactory to Landlord, of payment thereof; (ii) an affidavit of the contractor(s) performing such Remodel Work stating that such Remodel Work has been fully completed and that all subcontractors and laborers who supplied labor for such Remodel Work (whose names and addresses shall be recited in the request) have been paid in full, and that all liens therefor that have been filed, if any, have been discharged of record; and (iii) a complete release and waivers of lien executed by said contractor(s) and releases and waivers of lien executed by subcontractors supplying labor exceeding Ten Thousand and 00/100 Dollars ($10,000.00), if any, for the Remodel Work; or in lieu thereof, an attorney's certification that the lien period for the Remodel Work performed by Tenant in the Demised Premises has expired and no liens in connection therewith have been filed; then Landlord shall, within thirty (30) days thereafter pay the remainder of the Tenant Allowance to Tenant.

Tenant's written request for payment of the Tenant Allowance, along with the completed documentation required above, should be sent to:

Westminster City Center Shopping Center / BU: 518201
Golfsmith USA, Inc. dba Golfsmith USA

> Brixmor GA Westminster LLC
> c/o Brixmor Property Group
> One Fayette Street, Suite 150
> Conshohocken, PA 19428
> Attn: Tenant Allowance Coordinator
> Email: tacoordinator@brixmor.com
> Phone: (610) 825-7100
> Facsimile: (610) 834-8110

(e)    If Landlord fails to pay Tenant the Tenant Allowance when due, Tenant shall have the right, at its option, to offset the amount owing from up to fifty percent (50%) of future installments of Minimum Annual Rent payable by Tenant under the Lease, as amended hereby, until Tenant is either paid the remaining amount of the Tenant Allowance owed by Landlord or Tenant recoups the entire amount.

(f)    If and to the extent that Tenant owes any monies to Landlord under the Lease at the time when Landlord is obligated to pay the Tenant Allowance to Tenant and such monies are more than thirty (30) days past due, Landlord shall be permitted to deduct those monies owed to it by Tenant from the Tenant Allowance. If Tenant has not satisfied all conditions for payment of the Tenant Allowance within twenty-four (24) months after the commencement of the Extended Term then, as of such day, Tenant waives any and all rights to the payment of the Tenant Allowance.

7.    **AS-IS.** Tenant acknowledges that it is currently occupying the Demised Premises (this being a renewal lease) and, accordingly, Tenant is accepting the Demised Premises in its "AS-IS/WHERE-IS" condition with no work of any sort to be performed by Landlord and no representation or warranty by Landlord as to the fitness of the Demised Premises, or any equipment servicing the Demised Premises, or as to any use permitted herein. Any and all work to the Demised Premises necessary for Tenant to operate its business in accordance with the terms of this Lease (the "Tenant's Work") shall be Tenant's obligation to perform at Tenant's sole cost and expense. Tenant will indemnify Landlord and save it harmless from and against any and all claims, actions, suits at law or equity, judgments, expenses, costs, liabilities, fines and debts in connection with any injury, loss or damage during any period of Tenant's Work.

8.    **NOTICE ADDRESS.** The portion of the Lease regarding notice addresses is hereby deleted and the following addresses shall be used for Landlord and Tenant until modified in writing:

> Landlord's Notice Address:
> Brixmor GA Westminster LLC
> c/o Brixmor Property Group
> 420 Lexington Avenue, 7th Floor
> New York, NY 10170
> Attention: Office of General Counsel, Property

> With a copy to:
> Brixmor GA Westminster LLC
> c/o Brixmor Property Group
> 40 Skokie Boulevard, Suite 600
> Northbrook, IL 60062
> Attention: Legal Department

> Tenant's Notice Address:
> Golfsmith USA, Inc.
> 11000 N. IH 35
> Austin, TX 78753

Westminster City Center Shopping Center / BU: 518201
Golfsmith USA, Inc. dba Golfsmith USA

9.   MISCELLANEOUS.

(a)   By the execution hereof, Tenant acknowledges the full and faithful performance by Landlord of the obligations to be performed by it under the Lease to the date hereof. Landlord is not in default under the terms and conditions of the Lease, and that no condition exists which, with the passage of time or the giving of notice, would constitute a default under the terms and conditions of the Lease. Tenant has no present right to set off and no present defense or counterclaim against enforcement of Tenant's obligations under the Lease.

(b)   The Lease and this Amendment set forth all the covenants, promises, agreements, conditions and understandings between the parties hereto concerning the Demised Premises and there are no covenants, promises, agreements, conditions or understandings, either oral or written, between them other than as herein set forth. All prior communications, negotiations, arrangements, representations, agreements and understandings, whether oral, written or both, between the parties hereto, and their representatives, are merged herein and extinguished, the Lease and this Amendment superseding and canceling the same.

(c)   In the event of any conflict between the terms of the Lease and this Amendment, the terms of this Amendment shall prevail. Except as specifically provided herein, all of the terms, provisions, covenants and conditions of the Lease are hereby ratified and confirmed and shall continue in full force and effect.

(d)   The captions and headings throughout this Amendment are for convenience and reference only, and in the same shall in no way be held or deemed to define, limit, describe, explain, modify, amplify or add to the interpretation, construction or meaning of any provision, or the scope or intent hereof, nor in any way affect this Amendment.

(e)   The individuals executing this Amendment hereby represent and warrant that they are empowered and duly authorized to so execute this Amendment on behalf of the parties they represent.

(f)   All terms not defined in this Amendment shall have the respective meanings ascribed to them in the Lease.

(g)   This Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and assigns.

(h)   This Amendment may be executed in several counterparts, each of which may be deemed an original, but all of which together shall constitute one and the same Amendment.

(i)   This Amendment shall for all purposes be deemed to include, as though set out in full within, the following attached documents: Exhibit A.

[Signature Page to Follow]

Westminster City Center Shopping Center / BU: 518201
Golfsmith USA, Inc. dba Golfsmith USA

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the day and year first above written.

TENANT:
GOLFSMITH USA, INC.,
a Texas corporation

By:_____

Name:  _____

Its:  _____

LANDLORD:
BRIXMOR GA WESTMINSTER LLC,
a Delaware limited liability company

By:_____
Name:   Thomas W. Litzler
Its:      Executive Vice President, President West Region

Westminster City Center Shopping Center / BU: 518201
Golfsmith USA, inc. dba Golfsmith USA

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the day and year first above written.

TENANT:
GOLFSMITH USA, INC.,
a Texas corporation

By: _____

Name: _DAVID SBENCE_____

Its: __SVP & CFO_____

LANDLORD:
BRIXMOR GA WESTMINSTER LLC,
a Delaware limited liability company

By:_____
Name:  Thomas W. Litzler
Its:     Executive Vice President, President West Region

Westminster City Center Shopping Center / BU: 518201
Golfsmith USA, Inc. dba Golfsmith USA

**EXHIBIT A**







September 3, 2019

VIA Federal Express

Golf Galaxy, LLC
c/o Dick's Sporting Goods, Inc.
345 Court Street
Coraopolis, PA 15108
Attention: John E. Hayes III, Senior Vice President, General Counsel
& via Email: john.hayes@dcsg.com

c/o Dick's Sporting Goods, Inc.
345 Court Street
Coraopolis, PA 15108
Attention: David Barnes; Matthew Irvin
& via Email: david.barnes@dcsg.com; matthew.irvin@dcsg.com

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
Attention: Scott K. Charles; Neil M. Snyder
Facsimile: (212) 403-2000
& via Email: skcharles@wlrk.com; nmsnyder@wlrk.com

Re:     Store #006 (Westminster, CO)
        Amended and Restated Sublease Agreement dated June 1, 2013 by and between Dick's
        Sporting Goods, Inc. ("Dick's") as successor to Golfsmith USA, L.L.C. and GOLFTEC
        Enterprises LLC ("GOLFTEC") (the "Sublease")

To whom it may concern:

This letter shall serve as notice on behalf of GOLFTEC that GOLFTEC elects to terminate the
Sublease effective September 30, 2019.

The Sublease expired May 31, 2017, and GOLFTEC has been holding over with the consent of
Dick's. Pursuant to Section 13 of the Sublease, a copy of which is enclosed herewith for your
ease of reference, GOLFTEC is currently a month to month tenant. Pursuant to Colorado
Revised Statutes §13-40-107, twenty-one (21) days' notice is required to terminate a month to
month tenancy.



Please coordinate closure details with Chad Covak, VP of Real Estate, ccovak@golftec.com, direct dial (303) 223-2349.

Sincerely,

Joseph L. Assell
President & CEO

Enclosure

Cc:   Lee Belitsky via e-mail Lee.Belitsky@dcsg.com
      Chad Covak
      Stacia Bank Delaney

# GOLF GALAXY

545 Court Street | Colorado, PA 15108
golfgalaxy.com



September 20, 2019

**VIA UPS OVERNIGHT DELIVERY**

GolfTEC Enterprises, LLC
67 Inverness Drive East, Suite 175
Englewood, CO 80112
Attention: Legal

RE:   **Notices of Termination-**

**Sublease Agreement dated January 12, 2007, by and between Golf Galaxy, LLC, successor to original sublandlord, as sublandlord ("Golf Galaxy") and GolfTEC Franchise Services, Inc., successor to original subtenant, as subtenant for certain premises in Lutz (Carrollwood) FL[1];**

**Amended and Restated Sublease Agreement dated May 1, 2012, by and between Golf Galaxy and GolfTEC Enterprises, LLC for certain premises in Arlington, TX;**

**Amended and Restated Sublease Agreement dated June 1, 2013, by and between Golf Galaxy and GolfTEC Enterprises, LLC for certain premises in Woodlands (Houston), TX;**

**Amended and Restated Sublease Agreement dated June 1, 2013, by and between Golf Galaxy and GolfTEC Franchise Services, Inc. for certain premises in Austin (Arboretum), TX; and**

**Amended and Restated Sublease Agreement dated June 1, 2013, by and between Golf Galaxy and GolfTEC Enterprises, LLC for certain premises in Westminster, CO.**

To Whom It May Concern:

    This letter is written to you to in response to GolfTEC Franchise Services, Inc. and GOLFTEC Enterprises, LLC's (GolfTEC Franchise Services, Inc. and GolfTEC Enterprises, LLC shall be collectively referred to as "GolfTEC") five purported notices of termination dated

---

[1] Note that the Sublease attached to GolfTEC's Notice for the Lutz (Carrollwood), FL location differs from Golf Galaxy's Sublease for this location. For purposes of this letter response, Golf Galaxy will quote the Amended and Restated Sublease Agreement dated June 1, 2013 provided by GolfTEC.



# **GOLF** GALAXY

345 Court Street / Coshocton, PA 15108
golfgalaxy.com

September 3, 2019 (the "Notices") with respect to the above-referenced Subleases (the "Subleases"). All capitalized terms not defined herein shall have the meaning as set forth in the Subleases.

Please be advised that Golf Galaxy hereby rejects GolfTEC's assertion set forth in the Notices that the Subleases have expired. Moreover, Golf Galaxy denies that it provided consent to GolfTEC's holdover as a month-to-month tenant in any of the Premises, as Golf Galaxy at all times has understood the Subleases to co-terminate with the extended terms of the Prime Leases.

Pursuant to Section 2(a) of the Subleases, "[t]he Sublease Term shall commence as of the Effective Date and shall expire on the same date as the expiration date of the Prime Lease ('Term'), unless terminated earlier pursuant to the terms of this Sublease." Further, in the event that Golf Galaxy renews a Prime Lease, "GolfTEC shall have the option to extend th[e] Sublease on the same terms for a period of time coterminous with the extended Prime Lease or new lease." Each Sublease requires that Golf Galaxy provide notice to GolfTEC of its intent to exercise any options. GolfTEC is required to respond "no later than thirty (30) days following said notice." The Subleases do not require that GolfTEC provide written notice of its intent to extend the Subleases.

As GolfTEC is aware, Golf Galaxy assumed the Subleases in Arboretum, TX, and Westminster, CO in bankruptcy *after* Golfsmith exercised its election to renew the terms of the Prime Leases, respectively. Upon information and belief, GolfTEC never notified Golfsmith that the Subleases should not co-terminate with the Prime Leases. Further, GolfTEC failed to respond to Golf Galaxy's notices to GolfTEC of its election to extend the term in Lutz (Carrollwood), FL and Woodlands, TX, or to indicate in any way that the Sublease in Arlington, TX should not co-terminate with the Prime Lease as extended in connection with the Third Amendment to Lease and Order approving the assignment of the Prime Lease to Golf Galaxy. Instead, GolfTEC's only response was to continue to act consistent with an intent to continue the Subleases through the extended terms of the Prime Leases.

GolfTEC also failed to notify Golf Galaxy of its position at Golf Galaxy's assumption of the Subleases. By contrast, GolfTEC held itself out as a valid Subtenant through its course of conduct during the lease acquisition process. By way of example, GolfTEC requested the ability to continue its operations during periods of closure of the Prime Lease premises to transition from Golfsmith to Golf Galaxy. GolfTEC raised the issue for the first time by letter dated April 30, 2019, from Joseph Assell to Lee Belitsky, long after the expiration of any notice period, after operating continuously for approximately two (2) years without discussion of holdover or payment of holdover rent.

It is understood that GolfTEC will vacate its premises as of the dates set forth in the Notices in accordance with Article 17 of the Subleases. Golf Galaxy hereby demands that GolfTEC continue to pay all Rent and other charges as the same become due pursuant to Article 10(d) of the Subleases through the end of the extended terms of the Prime Leases as set forth on the enclosed schedule, attached hereto and made a part hereof. In the alternative, should GolfTEC wish to pay such Rent and other charges in a lump sum, Golf Galaxy hereby demands a payment of Four

CONFIDENTIAL LIVES WITHIN

# **GOLF** GALAXY

345 Court Street, Coraopolis, PA 15108
golfgalaxy.com

Hundred Sixty Three Thousand, One Hundred Thirty Five and 00/100 Dollars ($463,135.00) on or before November 1, 2019 in order to fully and finally resolve this matter.

In addition, Golf Galaxy hereby reserves its right to pursue additional damages arising out of GolfTEC's failure to assert its holdover position and course of conduct establishing Sublease termination dates co-terminous with the Prime Leases, including but not limited to remodeling costs and attorney's fees. Notwithstanding anything in this letter to the contrary, Golf Galaxy: (i) is not waiving any of GolfTEC's obligations under the Subleases, and (ii) reserves any and all rights and remedies available under the Subleases, at law, or in equity.

Very truly yours,
GOLF GALAXY, LLC
By: Dick's Sporting Goods, Inc.
Its Sole Member

By: _____

Name: _____Lee J Belitsky_____

Title: _____EVP & CFO_____

Enclosure

CONFIDENTIAL - LIVE - WITHIN

| Store # | Location | Sublease Expiration | Total Rent through Sublease Expiration |
|---------|----------|---------------------|----------------------------------------|
| 03201 | Austin, TX | 1/31/2022 | 64,838 |
| 03211 | Lutz, FL | 12/31/2024 | 216,945 |
| 03221 | Dallas/Arlington, TX | 6/30/2022 | 44,426 |
| 03229 | Woodlands, TX | 6/30/2024 | 98,309 |
| 03234 | Westminster, CO | 10/31/2020 | 38,618 |
| | | Total: | 463,135 |





October 7, 2019

**VIA Federal Express**

Golf Galaxy, LLC
c/o Dick's Sporting Goods, Inc.
345 Court Street
Coraopolis, PA 15108
Attention: Lee J. Belitsky, EVP & CFO
& via Email: Lee.Belitsky@dcsg.com

Re:   GOLFTEC Store #360 (Carrollwood-Tampa, FL)
Amended and Restated Sublease Agreement dated June 1, 2013 by and between Dick's Sporting Goods, Inc. ("Dick's") as successor to Golfsmith USA, L.L.C. and GOLFTEC Franchise Services, Inc. ("GOLFTEC") (the "Carrollwood Sublease")

GOLFTEC Store #030 (Arlington, TX)
Amended and Restated Sublease Agreement dated May 1, 2012, by and between Dick's Sporting Goods, Inc. ("Dick's") as successor to Golfsmith USA, L.L.C. and GOLFTEC Enterprises, LLC ("GOLFTEC") (the "Arlington Sublease")

GOLFTEC Store #015 (Houston, TX - Woodlands)
Amended and Restated Sublease Agreement dated June 1, 2013 by and between Dick's Sporting Goods, Inc. ("Dick's") as successor to Golfsmith USA, L.L.C. and GOLFTEC Enterprises, LLC ("GOLFTEC") (the "Woodlands Sublease")

GOLFTEC Store #303 (Arboretum, TX)
Amended and Restated Sublease Agreement dated June 1, 2013, by and between Dick's Sporting Goods, Inc. ("Dick's") as successor to Golfsmith USA, L.L.C. and GOLFTEC Franchise Services, Inc. ("GOLFTEC") (the "Arboretum Sublease")

GOLFTEC Store #006 (Westminster, CO)
Amended and Restated Sublease Agreement dated June 1, 2013 by and between Dick's Sporting Goods, Inc. ("Dick's") as successor to Golfsmith USA, L.L.C. and GOLFTEC Enterprises LLC ("GOLFTEC") (the "Westminster Sublease")

Lee:

We are in receipt of your letter dated September 20, 2019, concerning the notices of termination provided by GOLFTEC for each of the above referenced Subleases.



As an initial comment, we note that the January 12, 2007, Sublease you indicate for Carrollwood was replaced by the Amended and Restated Sublease Agreement dated June 1, 2013, noted above.

As you note in your letter and as each of the Subleases provides, in the event that either Golfsmith of Golf Galaxy, as successor to Golfsmith, renews a Prime Lease "GolfTEC shall have the option to extend th[e] Sublease on the same terms for a period of time coterminous with the extended Prime Lease or new lease." As you also note, GolfTEC is to respond no later than thirty (30) days following notice from Golf Galaxy or Golfsmith, as applicable. As you also note, GolfTEC did not respond to notices provided by Golf Galaxy of its extension of the Carrollwood, FL and Woodlands, TX Prime Leases. Golf Galaxy did not provide GolfTEC notice of its extension of the Arlington, TX Prime Lease and GolfTEC did not receive notices of extension of the Prime Leases for Arboreteum, TX or Westminster, CO from either Golf Galaxy or Golfsmith.

Contrary to your assertion that failure to respond results in automatic exercise of the option to extend the term of each Sublease for the same term as each Prime Lease was extended, GolfTEC's failure to provide notice of exercise results in the option to exercise expiring. The fact that an option to extend expires if not exercised within the time period provided in a lease document is well established by case law. If failure to respond to notice of extension of a Prime Lease was to be deemed to be exercise, the Sublease should have so provided.

GolfTEC did not make any representations to Golf Galaxy regarding the terms of the noted Subleases. GolfTEC merely continued to occupy the Subleased Premises pursuant to the holdover provisions of the applicable Subleases. Such holdover was not objected to by either Golfsmith or Golf Galaxy and, in fact, as you acknowledge in your September 20th letter, Golf Galaxy desired that GolfTEC continue to occupy the Subleased Premises. By operation of law, holding over resulted in the term of each sublease becoming a month to month lease terminable as provided by law in each applicable state. As such, no rent is due following the termination and GolfTEC declines to pay any amount beyond the dates indicated in each applicable notice of termination.

While we disagree with your position that the indicated Subleases were extended for the same term of the Prime Lease, even if that were the case, Section 10 of each Sublease contains the provisions applicable to a decision by GolfTEC to cease operating. Golf Galaxy's potential remedies in such event are specified in Section 10 of each Sublease. In no event would GolfTEC be responsible for additional damages, remodeling costs, or any other damages not specified in Section 10. In addition, Golf Galaxy does have an obligation to mitigate damages as provided by applicable law.

If you have cases, statutory or other legal authority to support your position, we would be pleased to review it.



**GOLFTEC.**

GolfTEC is prepared to vigorously defend its position and in the event of litigation between the parties, pursuant to Section 29 of each Sublease the prevailing party is entitled to costs and expenses including reasonably attorney's fees and expenses.

Sincerely,

Joseph L. Assell
President & CEO

Cc:     Golf Galaxy, LLC,  c/o Dick's Sporting Goods, Inc.
        345 Court Street
        Coraopolis, PA 15108
        Attention: John E. Hayes III, Senior Vice President, General Counsel
        & via Email: john.hayes@dcsg.com

        c/o Dick's Sporting Goods, Inc.
        345 Court Street
        Coraopolis, PA 15108
        Attention: David Barnes; Matthew Irvin
        & via Email: david.barnes@dcsg.com; matthew.irvin@dcsg.com

        Wachtell, Lipton, Rosen & Katz
        51 West 52nd Street
        New York, NY 10019
        Attention: Scott K. Charles; Neil M. Snyder
        Facsimile: (212) 403-2000
        & via Email: skcharles@wlrk.com; nmsnyder@wlrk.com

        Chad Covak
        Stacia Bank Delaney

# **GOLF** GALAXY

345 Court Street  I  Coraopolis, PA  15108
golfgalaxy.com



October 24, 2019

**VIA UPS OVERNIGHT DELIVERY**

Joseph L. Assell
GolfTEC Enterprises, LLC
67 Inverness Drive East, Suite 175
Englewood, CO 80112

      RE:    Notices of Termination-

            Amended and Restated Sublease Agreement dated June 1, 2013, by and
between Golf Galaxy, LLC, successor to original sublandlord, as sublandlord
("Golf Galaxy") and GolfTEC Franchise Services, Inc., successor to original
subtenant, as subtenant for certain premises in Lutz (Carrollwood) FL;

            Amended and Restated Sublease Agreement dated May 1, 2012, by and
between Golf Galaxy and GOLFTEC Enterprises, LLC for certain premises
in Arlington, TX;

            Amended and Restated Sublease Agreement dated June 1, 2013, by and
between Golf Galaxy and GOLFTEC Enterprises, LLC for certain premises
in Woodlands, TX;

            Amended and Restated Sublease Agreement dated June 1, 2013, by and
between Golf Galaxy and GolfTEC for certain premises in Austin
(Arboretum), TX;

            Amended and Restated Sublease Agreement dated June 1, 2013, by and
between Golf Galaxy and GOLFTEC Enterprises, LLC for certain premises
in Westminster, CO; and

            Amended and Restated Sublease Agreement dated June 1, 2013, by and
between Golf Galaxy and GolfTEC Franchise Services, Inc. for certain
premises in Chandler, AZ.

Dear Joe:

      This letter is written in response to your letter of October 7, 2019, relating to GolfTEC's
notices of termination for the five (5) Subleases referenced therein, as well as GolfTEC's most

CONFIDENCE LIVES WITHIN

# GOLF GALAXY

345 Court Street  |  Coraopolis, PA 15108
golfgalaxy.com

recent notice of termination dated October 18, 2019 for Chandler, Arizona. As I stated in our previous communications on this issue, Golf Galaxy has at all times understood that GolfTEC elected to extend the terms of all of the Subleases in the portfolio to co-terminate with the Prime Leases. This understanding is based on GolfTEC's own actions, including its failure to notify Golf Galaxy that it did not intend for the Subleases to co-terminate with the Prime Leases, and GolfTEC's ongoing actions consistent with an intent to continue the Subleases through the extended terms of the Prime Leases.

GolfTEC now takes the position that it is a month-to-month holdover tenant in the eleven (11) locations set forth on the enclosed schedule, and that such Subleases do not co-terminate with the Prime Leases (for ease of reference only, such eleven (11) locations shall be referred to herein as the "Expired Subleases"). If that were the case, under Section 13 of the Expired Subleases[1], GolfTEC would be obligated to pay rent during holdover "at the rent stated in the Prime Lease or one hundred fifty percent (150%) of its then current Rent, whichever is less" (hereinafter, "Holdover Rent"). In addition to other remedies, GolfTEC would also be required to indemnify Golf Galaxy as to "any and all liabilities, claims, demands, actions, losses, damages, obligations, costs and expenses, including, without limitation, attorney's fees (including the allocated costs of [Golf Galaxy's] in house attorneys) incurred or suffered by [Golf Galaxy]" in connection with the holdover. GolfTEC has never paid Holdover Rent pursuant to the Expired Subleases, and Golf Galaxy has incurred substantial damages in connection with GolfTEC's failure to disclose its position, including but not limited to architectural fees, construction costs, and attorney's fees.

In your letter of October 7, 2019, you attempt to sidestep these obligations by arguing, for the first time, that GolfTEC had Golf Galaxy's "consent" to hold over as a month-to-month tenant. GolfTEC argues that this "consent" excuses GolfTEC from paying the Holdover Rent set forth in Section 13, and from complying with its indemnification obligations.

Your position is incorrect. First, the Expired Subleases present two (2) possible options at term expiration: a) GolfTEC extends the Expired Sublease to co-terminate with the Prime Lease under Section 2; or b) GolfTEC becomes a holdover tenant pursuant to Section 13. There is no alternate option for GolfTEC to continue operating under the Expired Subleases without paying Holdover Rent or indemnifying Golf Galaxy for resulting losses. GolfTEC cannot avail itself of the benefits and protections afforded by the Expired Subleases to a valid Subtenant (including the ability to pay contract rent), while also arguing that it is entitled to the flexibility of a month-to-month tenant. Likewise, GolfTEC cannot escape Golf Galaxy's contractual remedies should GolfTEC assume a holdover position.

Secondly, Golf Galaxy did not—and could not—provide consent for GolfTEC to continue operating under the Expired Subleases as a holdover tenant, as it had no knowledge that GolfTEC believed the Expired Subleases had expired. Golf Galaxy always believed GolfTEC

---

[1] Note that the preceding statement does not apply to the Sublease for Cascade, OR, dated November 22, 2006, which does not contain a holdover provision. Please advise if this is not the most recent Sublease in GolfTEC's possession.

CONFIDENCE LIVES WITHIN

# GOLF GALAXY

345 Court Street | Coraopolis, PA 15108
golfgalaxy.com

had extended the term of the Expired Subleases to co-terminate with the Prime Leases (as you appear to acknowledge in your letter of April 30, 2019), and GolfTEC never gave Golf Galaxy reason to believe otherwise. Golf Galaxy has always acted consistently with that understanding. In fact, had Golf Galaxy believed that GolfTEC was a holdover tenant, it would have demanded Holdover Rent.

Therefore, Golf Galaxy hereby demands reimbursement of all unpaid Holdover Rent, retroactive to the Expired Sublease expiration dates alleged by GolfTEC, in the amount of Two Hundred Thousand Sixty-Two Thousand, One Hundred Fourteen and 00/100 Dollars ($262,114.00)[2]. Please remit payment within thirty (30) days.

In addition, Golf Galaxy accepts that the six (6) above-referenced Subleases were terminated by GolfTEC's Notices of Termination without prejudice as to the parties' rights under other Subleases. However, as to the remaining five (5) Expired Subleases, Golf Galaxy does not consent to GolfTEC's position as a holdover subtenant. Please ensure that GolfTEC remits payment of Holdover Rent for all Expired Sublease locations for which GolfTEC remains a holdover subtenant from this date forward.

Golf Galaxy further reserves any and all rights and remedies available under the Expired Subleases, at law, or in equity, including but not limited to: interest on retroactive Holdover Rent, Golf Galaxy's right to evict GolfTEC and collect damages, and Golf Galaxy's entitlement to indemnity pursuant to Section 13 of the Expired Subleases.

Very truly yours,
GOLF GALAXY, LLC
By:   Dick's Sporting Goods, Inc.
      Its sole member

By: _____
Name: Lee J. Belitsky
Title:   EVP & Chief Financial Officer

Enclosure

cc:
GolfTEC Enterprises, LLC
67 Inverness Drive East, Suite 175
Englewood, CO 80112
Attention: Legal

---

[2] For the five Expired Sublease locations terminated by GolfTEC, Golf Galaxy has calculated retroactive Holdover Rent through the purported dates of termination. For the remaining Expired Subleases, Golf Galaxy has calculated the retroactive Holdover Rent through October 31, 2019.

CONFIDENCE LIVES WITHIN

| Store # | Location | Sublease expiration date per GolfTEC | GGXY Expiration | Sublease Termination Date | Holdover Rent Due |
|---------|----------|--------------------------------------|-----------------|---------------------------|-------------------|
| 03201 | Austin, TX | 1/31/2017 | 1/31/2022 | 10/4/2019 | 24,778 |
| 03211 | Lutz, FL | 12/31/2017 | 12/31/2024 | 9/30/2019 | 20,258 |
| 03221 | Dallas-Arlington, TX | 4/30/2017 | 6/30/2022 | 10/4/2019 | 26,989 |
| 03229 | The Woodlands, TX | 6/30/2019 | 6/30/2024 | 10/4/2019 | 1,884 |
| 03234 | Westminster, CO | 5/31/2017 | 10/31/2020 | 9/30/2019 | 25,642 |
| 01361 | Raleigh, NC | 12/31/2017 | 12/31/2022 | N/A | 15,435 |
| 03212 | Chandler, AZ | 9/30/2014 | 9/30/2024 | 10/31/2019 | 50,833 |
| 03232 | Altamonte Springs, FL | 2/28/2015 | 2/29/2020 | N/A | 73,881 |
| 03202 | San Jose, CA | 2/28/2018 | 2/28/2023 | N/A | 16,667 |
| 03205 | Cascade, OR | 12/31/2017 | 12/31/2023 | N/A | - |
| 03204 | Lakeside, MI | 12/31/2018 | 12/31/2026 | N/A | 5,747 |
| | | | | Total: | 262,114 |

# Affidavit of Process Server

## DISTRICT COURT, COUNTY OF ADAMS, STATE OF COLORADO

(NAME OF COURT)

GOLFTEC ENTERPRISES LLC  GOLF GALAXY, LLC, a MINNESOTTA limited liability company; a Colorado limited liablity Co.  vs and DICK'S SPORTING GOODS INC., a Delaware corporation.  2019CV031816

PLAINTIFF/PETITIONER                    DEFENDANT/RESPONDENT                    CASE #

FILING ID: C236BF5A2573B
CASE NUMBER: 2019CV31816

I declare that I am a citizen of the United States, over the age of eighteen and not a party to this action.  And that within the boundaries of the state where service was effected, I was authorized by law to perform said service.

**Service:**  I served   GOLFTEC ENTERPRISES LLC,  a Colorado limited liablity Co.

NAME OF PERSON/ENTITY BEING SERVED

With the (documents)        1.) District Court Civil Summons.

By serving        DICK'S SPORTING GOODS, INC., c/o Corporation Service Company

NAME                                    RELATIONSHIP

At ☐ Home  _____

☒ Business        1900 W. Littleton Blvd., Littleton Colorado 80120.

on   November 15, 2019          at        12:20  p.m.
          DATE                                    TIME

Thereafter copies of the document were mailed by prepaid, first class mail on        11/15/2019
                                                                                      DATE

From        Denver,          Colorado
          CITY                STATE

**Manner of Service:**  ☐ By personally delivering copies to the person/authorized agent of entity being served.
☒ By leaving, during office hours, copies at the office of the person/entity being served, leaving same with the person apparently in charge thereof.
☐ By leaving copies at the dwelling house or usual place of abode of the person being served, with a member of the household 18 or older and explaining the general nature of the papers.
☐ by posting copies in a conspicuous manner to the address of the person/entity being served.

**Non-Service:**  After due search, careful inquiry and diligent attempts at the address(es) listed above, I have been unable to effect process upon the person/entity being served because of the following reason(s):
☐ Unknown at Address      ☐ Evading        ☐ Moved, Left no Forwarding      ☐ Other:
☐ Address Does Not Exist   ☐ Service Cancelled by Litigant    ☐ Unable to Serve in a Timely Fashion

**Service Attempts:**  Service was attempted on: (X) 11/15/19, 12:20 p.m., ( ) _____
                                              DATE      TIME                    DATE        TIME

( ) _____ , ( ) _____ , ( ) _____
      DATE      TIME          DATE      TIME          DATE      TIME

Description: Age: _____ Sex: _____ Race: _____ Hgt: _____ Wgt: _____ Hair: _____ Glasses: _____

I declare under penalty of perjury that the information contained herein is true and correct and this affidavit was executed on
11/15/19 ____ at ____ Littleton, ____ , CO. ____
DATE              CITY              STATE

SIGNATURE OF PROCESS SERVER
Anthony J. Gerardo, III

State of Colorado
County of Arapahoe            subscribed and sworn before me, a notary public this 15th day of November, 2019

WITNESS MY HAND AND OFFICIAL SEAL

NOTARY PUBLIC

LARIAH I LEE-DAVIS - NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20194040793
MY COMMISSION EXPIRES OCTOBER 26, 2023

# Affidavit of Process Server

## DISTRICT COURT, COUNTY OF ADAMS, STATE OF COLORADO

(NAME OF COURT)

GOLFTEC ENTERPRISES LLC   GOLF GALAXY, LLC, a MINNESOTA limited liablity company,   DATE FILED: November 15, 2019 9:49 AM
a Colorado limited liablity Co.  vs  and DICK'S SPORTING GOODS INC., a Deleware Corporation.   2019CV031816   FILING ID: 5263BFF152B75B
PLAINTIFF/PETITIONER                    DEFENDANT/RESPONDENT                    CASE #
CASE NUMBER: 2019CV31816

I declare that I am a citizen of the United States, over the age of eighteen and not a party to this action. And that within the boundaries of the state where service was effected, I was authorized by law to perform said service.

**Service:**   I served   GOLFTEC ENTERPRISES LLC,  a Colorado limited liablity Co.

NAME OF PERSON/ENTITY BEING SERVED

With the (documents)   1.) District Court Civil Summons.

By serving   GOLF GALAXY, LLC, c/o Corporation Service Company

NAME                                    RELATIONSHIP

At ☐ Home

☒ Business   1900 W. Littleton Blvd., Littleton Colorado 80120.

on   November 15, 2019   at   12:20 p.m.

DATE                          TIME

Thereafter copies of the document were mailed by prepaid, first class mail on   11/15/2019

DATE

From   Denver,              Colorado

CITY                          STATE

**Manner of Service:**   ☐ By personally delivering copies to the person/authorized agent of entity being served.
☒ By leaving, during office hours, copies at the office of the person/entity being served, leaving same with the person apparently in charge thereof.
☐ By leaving copies at the dwelling house or usual place of abode of the person being served, with a member of the household 18 or older and explaining the general nature of the papers.
☐ by posting copies in a conspicuous manner to the address of the person/entity being served.

**Non-Service:**   After due search, careful inquiry and diligent attempts at the address(es) listed above, I have been unable to effect process upon the person/entity being served because of the following reason(s):
☐ Unknown at Address       ☐ Evading       ☐ Moved, Left no Forwarding       ☐ Other:
☐ Address Does Not Exist    ☐ Service Cancelled by Litigant   ☐ Unable to Serve in a Timely Fashion

**Service Attempts:**   Service was attempted on: (X) 11/15/19, 12:20 p.m., (  ) _____
DATE      TIME                    DATE        TIME

(  ) _____ , (  ) _____ , (  ) _____
DATE      TIME         DATE      TIME         DATE      TIME

Description: Age: _____ Sex: _____ Race: _____ Hgt: _____ Wgt: _____ Hair: _____ Glasses: _____

I declare under penalty of perjury that the information contained herein is true and correct and this affidavit was executed on
11/15/19   at   Littleton,  ,  CO.
DATE            CITY          STATE

SIGNATURE OF PROCESS SERVER
Anthony J. Gerardo, III

State of Colorado
County of  Arapahoe              subscribed and sworn before me, a notary public this  15th  day of  November, 2019

WITNESS MY HAND AND OFFICIAL SEAL

NOTARY PUBLIC

LARIAH I LEE-DAVIS - NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20194040793
MY COMMISSION EXPIRES OCTOBER 25, 2023